## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

**CAROLINE S. BILES,**

      **Plaintiff,**

**vs.**                        **Case No.  4:15cv488-MW/CAS**

**CAROLYN W. COLVIN,**
**Acting Commissioner of the Social**
**Security Administration,**

      **Defendant.**

_____/

## REPORT AND RECOMMENDATION

This is a Social Security case referred to the undersigned magistrate judge for a report and recommendation pursuant to 28 U.S.C. § 636(b) and Local Rule 72.2(D).  It is now before the Court pursuant to 42 U.S.C. § 405(g) for review of the final determination of the Acting Commissioner (Commissioner) of the Social Security Administration (SSA) denying Plaintiff's application for a period of disability and Disability Insurance Benefits (DIB) pursuant to Title II of the Social Security Act (Act).  After consideration of the record, it is recommended that the decision of the Commissioner be affirmed.

## I. Procedural History

On April 26, 2012, Plaintiff, Caroline S. Biles, filed an application DIB alleging disability beginning June 1, 2011, based on back issues, paralysis in face, arms, hands and legs; high blood pressure; anxiety and depression; hearing loss, inability to hear in right ear and hearing loss in left ear; and memory impairment.[1]  Tr. 18, 79-80, 165-66, 175, 180.  (Citations to the transcript/administrative record, ECF No. 19, replacing ECF No. 9, *see* ECF No. 21, shall be by the symbol "Tr." followed by a page number that appears in the lower right corner.)  Plaintiff's date last insured for DIB was December 31, 2012.  Tr. 18, 79.

Plaintiff's application was denied initially on October 8, 2012, and upon reconsideration on December 19, 2012.  Tr. 18, 78, 115-27.  On February 4, 2013, Plaintiff requested a hearing.  Tr. 18, 129.  On February 20, 2014, Administrative Law Judge (ALJ) Andrew Dixon, III, held a hearing in Tallahassee, Florida.  Tr. 18, 33-76.  Gail E. Jarrell, an impartial vocational expert (VE), testified during the hearing.  Tr. 18, 33, 35, 68-75, 162-64 (Resume).  David G. Sullivan, an attorney, represented Plaintiff at the hearing.  Tr. 18, 33, 35, 129-30.

---

[1]  Plaintiff's application for Supplemental Security Income disability benefits was denied on July 6, 2012, and is not at issue in this case.  Tr. 103-14.

On March 28, 2014, the ALJ entered a decision and denied Plaintiff's application for benefits concluding that Plaintiff was not disabled from June 1, 2011, the alleged onset date, through December 31, 2012, the date last insured.  Tr. 27.

On May 5, 2014, Plaintiff requested review of the ALJ's decision. Tr. 5-7.  On August 6, 2015, the Appeals Council considered the reasons Plaintiff disagreed with the ALJ's decision and concluded "that this information does not provide a basis for changing the [ALJ's] decision." Tr. 1-4.  The Appeals Council denied Plaintiff's request for review of the ALJ's decision making the ALJ's decision the final decision of the Commissioner.  *See* 20 C.F.R. § 416.1481.

On October 10, 2015, Plaintiff, by counsel, filed a Complaint with the United States District Court seeking review of the ALJ's decision.  ECF No. 1.  The parties filed memoranda of law, ECF Nos. 17 and 20, which have been considered.

## II. Findings of the ALJ

The ALJ made several findings:

1. "The claimant last met the insured status requirements of the Social Security Act on December 31, 2012."  Tr. 20.

2. "The claimant did not engage in substantial gainful activity during the period from her alleged onset date of June 1, 2011 through her date last insured of December 31, 2012."  *Id.*

3. "Through the date last insured, the claimant had the following severe impairments: lumbar degenerative disc disease, bulging, disc protrusion, lumbar scoliosis; cervical degenerative disc disease with disc narrowing; and, right shoulder and right rotator cuff tendinopathy." Tr. 20. The ALJ considered Plaintiff's complaints of, or references to, hypertension, carpal tunnel syndrome, and hearing loss, finding no significant functional limitations were established in conjunction with these conditions. *Id.* The ALJ considered Plaintiff's report of having bipolar disorder finding that there was no evidence of this being a current diagnosis. Tr. 21. The ALJ also considered the four broad functional areas set out disability regulations for evaluating mental disorders and in section 12.00C of the Listing of Impairments known as the "paragraph B" criteria and determined that Plaintiff had *no* limitation in activities of daily living; *mild* limitation in social functioning; *mild* limitation in concentration, persistence, or pace; and *no* episodes of decompensation, which have been of extended duration. *Id.*

4. "Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." Tr. 22.

5. "[T]hrough the date last insured, the claimant had the residual functional capacity [RFC] to perform light work as defined in 20 CFR 404.1567(b) except the claimant can lift/carry and push/pull ten pounds frequently and fifteen pounds occasionally. The claimant can sit no more than thirty to forty-five minutes before standing to relieve any discomfort. He [sic] can stand for thirty to forty[-]five minutes before having to sit and rest. The claimant can walk fifty yards before having to stop. The claimant cannot climb ladders, ropes or scaffolds can occasionally climb stairs and ramps. He [sic] can frequently balance and crawl and occasionally kneel, crouch, stoop. The claimant can tolerate up to frequent exposure to hazards, such as unprotected heights and heavy machinery. The claimant cannot reach overhead with his [sic] dominant, right upper extremity, but he [sic] can frequently reach in all directions and frequently handle, finger, and feel. The claimant

has no restrictions to the use of his [sic] non-dominant left upper extremity.  In formulating this opinion, the undersigned relied on the record evidence as a whole (Exhibit Sections A through F) along with the testimony provided at the hearing."  Tr. 23.

6. "Through the date last insured, the claimant was capable of performing past relevant work as a front desk receptionist.  This work did not require the performance of work-related activities precluded by the claimant's [RFC]."  Tr. 26.

7. "The claimant was not under a disability, as defined in the Social Security Act, from June 21, 2011, the alleged onset date, through the date last insured."  Tr. 27.

## III. Legal Standards Guiding Judicial Review

This Court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles.  42 U.S.C. § 405(g); <u>Chester v. Bowen</u>, 792 F.2d 129, 131 (11th Cir. 1986).  "Substantial evidence is more than a scintilla, but less than a preponderance.  It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." <u>Bloodsworth v. Heckler</u>, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); <u>accord Moore v. Barnhart</u>, 405 F.3d 1208, 1211 (11th Cir. 2005).  "The Commissioner's factual findings are conclusive if supported by substantial evidence." <u>Wilson v. Barnhart</u>, 284 F.3d 1219, 1221 (11th Cir. 2002) (citations omitted).  The court may not reweigh the evidence or substitute

its own judgment for that of the ALJ even if it finds that the evidence preponderates against the ALJ's decision.  <u>Moore</u>, 405 F.3d at 1211.[2]

"In making an initial determination of disability, the examiner must consider four factors: '(1) objective medical facts or clinical findings; (2) diagnosis of examining physicians; (3) subjective evidence of pain and disability as testified to by the claimant and corroborated by [other observers, including family members], and (4) the claimant's age, education, and work history.'" <u>Bloodsworth</u>, 703 F.2d at 1240 (citations omitted).

A disability is defined as a physical or mental impairment of such severity that the claimant is not only unable to do past relevant work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).  A disability is an "inability to engage

---

[2] "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it." <u>Phillips v. Barnhart</u>, 357 F.3d 1232, 1240, n.8 (11th Cir. 2004) (citations omitted).  "A 'substantial evidence' standard, however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which support the ALJ.  A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ." <u>Tieniber v. Heckler</u>, 720 F.2d 1251, 1253 (11th Cir. 1983). "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'" <u>Cowart v. Schweiker</u>, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *see* 20 C.F.R. § 404.1509 (duration requirement).  Both the "impairment" and the "inability" must be expected to last not less than 12 months.  Barnhart v. Walton, 535 U.S. 212 (2002).

The Commissioner analyzes a claim in five steps.  20 C.F.R. § 404.1520(a)(4)(i)-(v).

1. Is the individual currently engaged in substantial gainful activity?

2. Does the individual have any severe impairments?

3. Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404, Subpart P?

4. Does the individual have the RFC to perform work despite limitations and are there any impairments which prevent past relevant work?

5. Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of the application for benefits.  A positive finding at step three results in approval of the application for benefits.  At step four, the claimant bears the burden of establishing a severe impairment that precludes the

performance of past relevant work.  Consideration is given to the assessment of the claimant's RFC and the claimant's past relevant work.  If the claimant can still do past relevant work, there will be a finding that the claimant is not disabled.  If the claimant carries this burden, however, the burden shifts to the Commissioner at step five to establish that despite the claimant's impairments, the claimant is able to perform other work in the national economy in light of the claimant's RFC, age, education, and work experience.  Phillips, 357 F.3d at 1237; Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986); 20 C.F.R. § 404.1520(a)(4)(v), (e) & (g). If the Commissioner carries this burden, the claimant must prove that he or she cannot perform the work suggested by the Commissioner.  Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

Plaintiff bears the burden of proving that she is disabled, and consequently, is responsible for producing evidence in support of her claim. *See* 20 C.F.R. § 404.1512(a); Moore, 405 F.3d at 1211.

## IV. The Evidence

### A.  Background Information

The Plaintiff was 54 years old when she filed her DIB application.

Tr. 79.  Plaintiff completed the seventh grade and special education classes, Tr. 181, 188, with a work history that includes an account specialist, front office coordinator, receptionist, and staffing specialist until March 2007 when she stopped working due to her medical condition and to take care of a sick relative.  Tr. 179-81, 202-08, 226; *see infra* at 31-41 (job descriptions).

### B.  The Medical Evidence

*Gary Winchester, M.D.*

Plaintiff received general medical care for back, headaches, and other conditions with Dr. Winchester between January 2010 and July 2013. Tr. 271-90, 317-50, 373-79.

*Gregg A. Alexander, M.D., Orthopedist*

A July 28, 2010, lumbar spine X-ray identified an anterior osteophyte at L2-3 and subtle lumbar scoliosis at L1 in the coronal plane, and the alignment was normal in the sagittal plane.  Other maladies were noted. Tr. 252.  Plaintiff was last seen on June 30, 2009.  Tr. 251.  No findings of the nerve compression were noted and low back pain with no neurologic deficit noted.  *Id.*  Home exercise program was recommended.  *Id.*

On March 2, 2011, Plaintiff reported increasing low back pain radiating into her legs with weakness.  Tr. 250.  Dr. Alexander noted normal

posture, range of motion (ROM) was mildly decreased in forward and backward bending; reflexes appeared symmetric; mild weakness of the left extensor hallucis longus and left hamstring muscles, with straight leg raising equivocal for leg pain, but clearly reproducing left sciatic notch pain. *Id*. He opined the findings were consistent with left L5 radiculopathy. *Id*.

A June 21, 2011, lumbar spine MRI indicated mild multilevel degenerative changes, including "marked ligamentum flavum and facet overgrowth" causing mild spinal canal compromise and mild diffuse disc bulge at L4-5, but without any focal disc protrusion or region of severe spinal or foraminal compromise. Tr. 249.

On July 6, 2011, Dr. Alexander noted that the MRI of the lumbar spine indicated disc bulging at L2-3 data noted on prior scans. Tr. 247. "It does not appear to be disc herniation at any level with significant central or neuroforaminal narrowing. There is facet arthropathy at multiple levels. No evidence of left L5 compression." *Id*. An examination indicated that Plaintiff's posture was normal and ROM was fairly good; reflexes were symmetric and there was no sensory or motor deficit detected; hips, knees, and ankles were normal; and gait, balance, and coordination were normal. *Id*.

On March 1, 2012, Dr. Alexander noted that Plaintiff was last seen on July 6, 2011, and was primarily there for a medication refill, requesting an increase in the strength or quantity of analgesics.  Physical examination was generally normal and the standing posture was normal and no trunk tilt or pelvic obliquity, minimal midline lower lumbar spine tenderness; ROM was mildly decreased in all planes; reflexes were symmetric and there was no sensory or motor deficit detected; hips, knees, and ankles were normal; and gait, balance, coordination were normal; and she had good foot pulses. Tr. 246.  The assessment included chronic low back pain on the basis of the disc degeneration and degenerative bulging at L2-3, but no findings of radiculopathy.  *Id.*  No changes were made in analgesics.  She was given Flexeril that replaced her current Tizanidine.  *Id.*

On June 11, 2012, Dr. Alexander noted Plaintiff's "standing posture is normal"; "there is moderate muscle tightness in the neck and upper back"; "cervical [ROM] mildly decreased and extension and rotation"; "Spurling and Lhermitte's tests are negative"; "deep tendon reflexes of the upper and lower extremities were normal"; "there is no muscle atrophy or fasciculation"; "[w]ith muscle strength testing there appears to be breakaway weakness and/or incomplete effort with testing the major muscle groups in the right upper extremity and right lower extremity"; "gait,

balance, and coordination appeared normal"; and "no outward sign of pain, discomfort, or difficulty with ambulation." Tr. 253.  Dr. Alexander's assessment was chronic low back pain on the basis of disc degeneration and degenerative bulging, without lumbar radiculopathy; and right facial, right upper extremity, and right lower extremity subjective numbness.  He "doubted the presence of true neurogenic weakness in the right arm and right leg.  The diagnostic evaluation is in progress." *Id.*

On September 11, 2012, Plaintiff was scheduled for a follow-up visit for pain management.  Tr. 297.  Plaintiff had an MRI of her cervical spine and brain performed on June 11, 2012, at the request of Dr. Ayala.  "The MRI of the brain is normal.  In the cervical spine and there are degenerative changes, and apparently there is mild cervical canal narrowing.  The radiologist specifically notes normal size and signal of the cord." *Id.* Plaintiff reported ongoing numbness in all extremities and severe pain of 9/10.  *Id.*  She described the symptoms as sharp and achy and did not differentiate between night and day; additional symptoms include swelling, bruising, numbness and weakness.  Symptoms are made worse with exercise.  She reported being able to sit or stand for less than five minutes each.  *Id.*  Plaintiff was unable to obtain an EMG until she had better insurance coverage.  *Id.*

Upon examination of the lumbar spine, standing posture was normal; no spinal deformity or abnormal curvature; no significant tenderness; ROM decreased in all planes; no specific sciatic notch tenderness; reflexes in the lower extremities were normal and Babinski's responses plantar; appeared to be non-neurogenic weakness in both lower extremities with a component of breakaway weakness; no muscle atrophy or fasciculation; and gait, balance, and coordination appeared normal.  Tr. 298.  Examination of the cervical spine indicated cervical ROM was essentially normal; Spurling and Lhermitte's test were negative; reflexes of the upper extremities were intact; Hoffman reflex absent; weakness was noted in the right hand intrinsics, but there was no tenderness of the cubital tunnel.  *Id.*

Dr. Alexander further noted what appeared to be incomplete effort with testing all major muscle groups of the right upper extremity.  *Id.*

Dr. Alexander's impression was degeneration of the lumbar or lumbosacral intervertebral disc; lumbago; degeneration of cervical intervertebral disc; and "subjective numbness in all extremities" with no objective findings of spinal cord compression or radiculopathy.  *Id.*  He noted that the neurological workup remained in progress and prescribed Hydrocodone-Acetaminophen.  *Id.*

On December 17, 2012, regarding a prior diagnosis, Dr. Alexander noted that there was subjective numbness in all extremities; no objective findings of spinal cord compression; no confirmatory findings of cervical radiculopathy or lumbar radiculopathy; and that the neurological workup remained in the process.  Tr. 436.  Lumbar examination showed that standing posture was normal; no spine deformity or abnormal curvature; no significant tenderness; ROM was decreased in all planes; and no specific sciatic notch tenderness.  The cervical spine examination showed that the cervical ROM was essentially normal; Spurling and Lhermitte's test was negative; alignment was normal; and moderate muscle tightness.
Dr. Alexander's impressions remained the same.  Tr. 435; *see* Tr. 434, 436-37.

On March 11, 2013, Plaintiff followed-up for pain management.
Tr. 430.  Plaintiff complained of increased pain around the right shoulder area, both in the posterior area around the scapula into the anterior right chest.  She reported her pain was made worse with coughing, but also with the motion of the right shoulder.  She stated the pain was constant and severe with a rating of 9/10.  *Id*.  As part of the general exam, it is noted that Plaintiff was oriented to time, place and person; her mood and affect were appropriate.  Under neurological (general exam), it is noted that

Plaintiff had good coordination and gait and balance were normal.  There were no pathologic reflexes; the tendon reflexes were intact; and incomplete effort and/or breakaway weakness to some degree in all extremities.  "True neurogenic weakness as possible.  No pathologic reflexes.  No muscle atrophy or fasciculation is noted.  The findings are especially present in the right upper extremity where there is immediate breakaway weakness with testing anterior deltoids, biceps, and supraspinatus.  These findings are possibly consistent with right C5 radiculopathy."  Tr. 431.  Cervical and lumbar spine ranges of motion were decreased.  *Id*.  Right shoulder ROM was normal; impingement testing was reported as painful.  *Id*.  Dr. Alexander's impression included the following: "There is increased pain in the right shoulder area.  This could certainly be multifactorial, including cervical radicular pain in the right shoulder.  There are no objective findings of spinal cord compression.  There are no confirmatory findings of cervical radiculopathy or lumbar radiculopathy.  The neurological workup remained in progress."  *Id*.

A March 29, 2013, cervical spine MRI indicated severe left-sided neural foraminal narrowing at C5-6, with a note to correlate clinically for left C6 radiculopathy due to possible left C6 nerve root compression.  Tr. 443.

On April 8, 2013, Dr. Alexander reported that the dominant finding of the MRI was "disc/osteophyte lateralizing to the asymptomatic left side at C5-6.  The central canal is adequate at all levels.  The cord is normal in size and signal."  Tr. 426.  As for mental status, Plaintiff was oriented to time, place, person, and her mood and affect were appropriate.  Tr. 427.  From a neurological standpoint, Plaintiff had good coordination and her gait and balance were normal; there were no pathologic reflexes and her deep tendon reflexes were intact.  *Id.*  With resisted strength testing, there was weakness of all major muscle groups in the right upper extremity.  There was quick breakaway weakness with testing the rotator cuff and deltoids, and pain was reported with shoulder test.  There was weakness or incomplete effort with testing all other muscles in the right arm and hand.  There was no muscle atrophy or fasciculation noted.  *Id.*  A lumbar spine examination indicated right lower lumbar tenderness and right sciatic notch tenderness and pain was reported with both forward and backward bending.  The cervical spine examination indicated that alignment was normal; no shoulder obliquity; ROM was mildly creased in all planes; Spurling and Lhermitte's appeared negative.  *Id.*  A right upper extremity exam indicated that pain was reported with active and passive motion of the right shoulder and there was breakaway weakness to testing of the

rotator cuff strength.  *Id.*  Plaintiff was continued on Hydrocodone–
Acetaminophen.  *Id.*  Dr. Alexander's impression included degeneration of
lumbar or lumbosacral intervertebral disc, lumbago, brachial neuritis or
radiculitis NOS, pain in joint, shoulder region, and degeneration of cervical
intervertebral disc.  There were no objective findings of spinal cord
compression.  *Id.*  A right shoulder MRI of April 22, 2013, indicated
tendinopathy of the rotator cuff, moderate to severe, with mild to moderate
osteoarthritis.  Tr. 438.

On June 11, 2013, Plaintiff's chief complaint was lower back and
bilateral leg pain.  Tr. 387, 422.  Dr. Alexander reviewed the April 22, 2013,
MRI results and noted that this involves the infraspinatus and
supraspinatus tendons.  He also noted that since the last visit there had
been the onset of bilateral anterior knee pain.  *Id.*  Dr. Alexander's
impressions included that there was right shoulder tendinopathy and
presumed bilateral chondromalacia patellae.  Normal ROM; no edema or
effusion; no joint line tenderness; and no instability.  Hydrocodone-
Acetaminophen were prescribed.  Plaintiff was referred to Dr. Thompson
for further specialized evaluation of the knees and right shoulder.  Tr. 388,
423.

On July 10, 2013, Plaintiff reported (to Dr. Thompson) severe knee and shoulder pain, Tr. 389-90.  Under neurological as part of the general exam it is noted that Plaintiff "has good coordination" and "[t]here is no weakness or sensory deficit.  Deep tendon reflexes are intact."  Additional examinations of Plaintiff's neck indicated no new tenderness, deformity, or injury; ROM was unremarkable; no gross instability and strength and tone were normal.  Examination of Plaintiff's lower back did not show any new tenderness, deformity, or injury; ROM was unremarkable; there was not gross instability and strength and tone were normal.  Dr. Thompson's impressions included shoulder impingement – right mild.  A plan called for conservative course of treatment including impingement protocol of activity modification, rotator cuff strengthening, and consideration of injection.  Surgery was recommended.  Tr. 390-91.

On September 18, 2013, Plaintiff was seen by Dr. Alexander.  Plaintiff was now in physical therapy.  Plaintiff's complaints regarding her spine were unchanged and this was a three-month visit for pain management.  Tr. 416.  Lumbar spine examination showed that standing posture was normal; no trunk tilt; ROM was moderately limited in flexion and extension.  Cervical spine examination showed that the alignment was normal; and moderate muscle tightness; ROM was decreased with extension and

rotation; Spurling and Lhermitte were negative.  Plaintiff was to continue physical therapy for shoulder and knee rehabilitation.  Hydrocodone-Acetaminophen were prescribed and side effects discussed.  Plaintiff was to return in three months for a follow-up.  Tr. 385-86, 416-17.

*Roland P. Jones, M.D., Neurologist*

On April 19, 2012, Plaintiff was evaluated by Dr. Jones, with Tallahassee Neurology Associates Pain Management, due to chronic and worsening back and knee pain, bilateral hand numbness, and cervicalgia. Tr. 242.  Dr. Jones advised Dr. Alexander that Plaintiff had "a peculiar pattern of functional giveaway weakness throughout" and "is having some hand numbness and some other unusual complaints" for which further evaluation was recommended.  Tr. 241.  After reviewing the June 2011 MRI, Dr. Jones' impression was (1) chronic mechanical back pain, likely facet arthropathic; (2) atypical weakness in the lower extremity with some give way or functional component; (3) complaints of bilateral upper extremity intermittent numbness with cervicalgia of unclear etiology. Tr. 243.  Dr. Jones advised Plaintiff to continue her prescribed medications of Zanaflex, Hydrocodone/APAP, and Tramadol; to consider facet injections; and to obtain an EMG of the upper extremities and MRI of the cervical spine.  Tr. 244.

*Tallahassee Neurological: Ricardo Ayala, M.D. and Winston Ortiz, M.D.*

On June 1, 2012, Plaintiff sought treatment with Dr. Ayala, with Tallahassee Neurological Clinic, due to right-sided paresthesias and weakness over the past year.  Tr. 263.  Upon observation (part of a detailed neurological examination), Dr. Ayala noted that Plaintiff had a "[p]articular examination considering that every single muscle of the right upper extremity and lower extremity seems weaker than the counterpart on the left side."  Tr. 265.  He also noted, however, "[w]eakness of the interosseous muscles but also weakness of the deltoid, biceps, triceps, iliopsoas, quadriceps, anterior tibialis" with impaired vibratory sensation and pin prick in both the right upper and lower extremities.  *Id.*  His impression was: "Hemiparesis, dominant side, right."  *Id.*  He recommended an EMG of the right extremity for ulnar neuropathy and, in the interim, suggested that Plaintiff avoid any pressure on the elbows and try to keep them straight as possible for most of the day. Tr. 266.

A June 11, 2012, cervical spine MRI indicated C5-6 chronic spondylosis with slight posterior slippage and posterior broad based disc protrusion slightly contacting the anterior surface of the spinal cord and resulting in mild narrowing of the sagittal dimension of the central spinal

canal; C3-4 posterior central towards right paracentral shallow disc protrusion e upon the thecal sac with no cord compromise or canal stenosis; C4-5 and C6-7 slight posterior disc annular bulges with no cord compromise or canal stenosis; uncovertebral joint thickening and disc space narrowing resulting in moderate left-sided and mild right-sided C5-6 cervical foraminal stenosis; and no intrinsic cervical spinal cord pathology from MRI perspective.  Tr. 259-60.

On June 20, 2012, Plaintiff followed up with Dr. Ayala who opined that an EEG was essentially unremarkable and the cervical spine MRI indicated "some degenerative disease."  Tr. 256, 261-62.  The clinical examination was the same, and the diagnoses were hemiparesis, dominant side, right; and ulnar neuropathy, right, for which Tramadol was prescribed. *Id.*

By December 2012, Plaintiff reported constant neck pain with ongoing weakness on the right side.  Tr. 380.  Upon examination (motor exam), Dr. Ortiz noted that she had difficulty doing tandem walking, and "went more to the right" that Plaintiff said was related to the weakness on the right side; posture was normal and there was no paraspinal muscle spasm; normal muscle tone in the upper and lower extremities; she had weakness of the interosseous muscles of the hand, but also weakness of

the deltoid, biceps, triceps, iliopsoas, quadriceps, anterior tibialis, and had giveaway weakness on the right side compared to the left, but 4/5 throughout.  Tr. 382.

After a car accident, on January 3, 2013, Plaintiff reported increased numbness and pain.  Tr. 357, 364-68.  Upon clinical examination, Dr. Ortiz noted decreased ROM of the neck and tenderness of the paraspinous muscles, and decreased ROM of the lumbar area.  Tr. 358.  The clinical examination was the same as in December.  *Id.*  An EMG/NCV study did not show any evidence of myopathy, neuropathy, or radiculopathy "except for carpal tunnel syndrome bilaterally which is probably causing some of the symptoms she is having after the motor vehicle accident." Dr. Ortiz further opined: "From my part she does have diffuse musculoskeletal pain as well as carpal tunnel syndrome bilaterally." Tr. 357, 363.  The diagnoses were pain in limb, headache, numbness, pain low back, pain neck, and carpal tunnel syndrome, for which wrist splints were prescribed.  Tr. 358-59.  Plaintiff's medications included Neurontin, Ultram, Hydrocodone-Acetaminophen, and Zanaflex.  Tr. 359.

On or about February 10, 2014, Plaintiff reported ongoing numbness and pain in her legs, and general lack of improvement of symptoms since 2012, and her diagnoses remained the same with ongoing evaluation.

Tr. 489.  The results of the physical examination indicated, in part, that Plaintiff was in no acute distress and she had decreased ROM, both of which remain unchanged from January 3, 2013.  She had no clubbing, cyanosis, or edema in her extremities, which remain unchanged from December 3, 2012.  Tr. 490.  Impressions included numbness/paresthesia assessed as deteriorated and carpal tunnel syndrome.  Tr. 491.

*Richard Senesac, Ph.D.*

On August 21, 2012, Dr. Senesac, a psychologist, noted that he had seen Plaintiff on two occasions on July 12 and 25, 2012, but had visited with her initially longer than seven years ago.  No records exist.  Tr. 292. Plaintiff returned to him on July 12, 2012, complaining of "anxiety and bipolar."  *Id.*  "She seemed to be in acute distress physically.  She walked with aid of a cane at the first session, but not at the second. . . . She wanted to see [him] to 'deal with' her anxiety and what she says was her bi-polar disorder."  *Id.*  He opined: "While I do believe she has physical problems, I believe her inability to manager her stress in a healthier way exacerbates her condition."  *Id.*  Dr. Senesac opined that Plaintiff "described to [him] no symptoms consistent with a history of bi-polar disorder.  She does have mood changes but they appear to be more reactive to stressors in her environment."  *Id.*  Dr. Senesac provided a

treating source medical status report.  Tr. 293-95.  Plaintiff's content was appropriate, concentration good, was well oriented x3, and her memory was intact.  Dr. Senesac observed that plaintiff walked with the aid of a cane and that she appeared to be in discomfort.  Tr. 294.  Plaintiff was competent to manage funds and that Plaintiff's "issues seem more physical than psychological."  Tr. 295.  Dr. Senesac concluded that he was unable to assess Plaintiff's capability of sustaining work activity for eight hours a day, five days a week as he had only seen her twice (last time on July 25, 2012), although he doubted "it from a physical point of view."  *Id.*

*Capital Regional Medical Center*

Plaintiff was treated for moderate neck pain on October 4, 2012. Tr. 337.

*Carla M. Holloman, D.O., Consultative Examiner*

Dr. Holloman examined Plaintiff at the Commissioner's request on September 20, 2012.  Tr. 300-05.  Plaintiff was observed to be tearful during the examination with blood pressure of 180/100.  Tr. 301.  Muscle strength was "5/5 on the left and 2-3/5 on the left [right]."  *Id.*  The spinal examination was normal at the spine and extremities were in good alignment and there was no paravertebral tautness or tenderness noted. Plaintiff was able to do tandem walking and straight leg raise testing was

negative.  Tr. 302.  Dr. Holloman noted diagnoses of back pain, neck pain,
right dominant hemiparesis, hypertension, hearing loss, and
depression/anxiety.  *Id.*  She further noted that Plaintiff was "not acutely
symptomatic during this examination," but instructed her to seek
emergency treatment for her blood pressure.  *Id.*  Dr. Holloman determined
that Plaintiff had normal ROM in all areas tested including but not limited to
her left and right wrist and hand.  Tr. 303-05.

*Non-Examining Medical Source Opinions*

In August and December 2012, non-examining psychologists James
L. Meyers, Psy.D., and Barbara Lewis, Ph.D., opined that Plaintiff's mental
impairments were not severe.  Tr. 85-85, 95-96.  In December 2012, non-
examining physician Edmund Molis, M.D., opined that Plaintiff was capable
of light exertional activity.  Tr. 97-99.  (An October 8, 2012, opinion was
rendered by a Single Decision Maker ("SDM") Serena Collins who is a non-
medical opinion.  Tr. 85-86.)

**C. Testimon**y

*Plaintiff's Testimony*

At the February 20, 2014, hearing, Plaintiff testified that she
completed the seventh grade and did not obtain a GED.  Tr. 39.  She
explained that in her past job as an "account specialist" at an assisted living

facility, she would "help answer phones . . . just greet people as they

walked in, and I was supposed to help do some accounting . . . like posting

into a computer receipts for the nursing home, . . . like food receipts," but

no patient billing.  Tr. 41-42.  Plaintiff had taken some banking courses

while she was a teller.  The courses dealt with customer service skills.

Tr. 42.  Plaintiff explained that the position was called an accounting

specialist, but required no special education.  She would take simple, little

receipts and post them in the computer.  Tr. 42-43; *see infra* at 31-41 for

more detail regarding Plaintiff's past relevant work.

Plaintiff testified that her chronic neck pain interfered the most with

her ability to work.  Tr. 44.  Before December 2012, the neck pain was at a

level of 7-8/10, and at the date of the hearing it was a 10-12/10 in severity.

Tr. 45.  She tried to continue to work with the neck pain.  *Id.*  Then, she

started having chronic right-sided and right hand pain, which was her

dominant hand, "some days my whole hand would just go numb typing."

Tr. 46.  It was difficult for her to work because her hand would go numb and

she would be unable to move her fingers.  Tr. 53.  When she was still

working, numbness was the problem, but now there is more pain in addition

to numbness.  Tr. 52.  Her right arm hurt more than her left, and she would

often drop things such as cans, and would have to use her left hand, but

could button her shirt.  Tr. 46.  Although her neck pain was the most severe, she also had chronic upper and lower back pain.  Tr. 49.

Before December 2012, Plaintiff had difficulty sitting and would have to "get up frequently" due to back and leg discomfort.  Tr. 55-56.  On a good day, she could sit for 30 minutes before getting up, but on a bad day she would alternate between sitting and standing every 10-15 minutes.  Tr. 56.  Plaintiff was "standing longer than I was sitting at that time."  *Id.*  However, she "couldn't stand for very long without getting extremely tired" and had difficulty standing at the time of the hearing.  Tr. 57-58.  At the time of the hearing, she was sitting for 30-60 minutes and then standing before sitting or lying down again, although it varies from day-to-day.  Tr. 58.  Plaintiff was able to carry a bag of groceries and hold a gallon of milk.  Tr. 59.  Prior to December 2012, she could cook depending on how she felt, but she would have to lie down and sometimes her husband would help.  Tr. 60.  Plaintiff would "sometimes lay down and rest in a recliner and then get up out of the recliner because that would hurt my back . . . and then sometimes I'd have to lay down.  So a good portion of the day, more than I'd say five hours during the day, I have to rest a lot . . . ."  Tr. 61.  Her husband and son would assist with household chores like vacuuming.  *Id.*  Plaintiff usually goes shopping on a day when her husband can assist and

will sometimes use a motorized cart.  Tr. 63.  Plaintiff stopped doing

activities and hobbies when her back and neck started hurting, and stated,

"I just really stay at home now."  Tr. 64.

*Vocational Expert Testimony*

After Plaintiff's counsel provided an opening statement, Tr. 39-40, a

colloquy transpired that included the ALJ, the VE, Plaintiff's counsel, and

Plaintiff.  This information is discussed herein at section V., B. as part of the

legal analysis portion of this Report and Recommendation.  *See infra* at 28-

31, 34-41.  Plaintiff testified followed by Ms. Jarrell's testimony, which is

also discussed herein.  *Id.*

## V.  Legal Analysis

### A. Remand is not merited pursuant to sentence six of 42 U.S.C. § 405(g).

Plaintiff argues that a remand to the Commissioner is merited

pursuant to sentence six of 42 U.S.C. § 405(g) because the vocational

expert misrepresented one of her qualifications.  ECF No. 17 at 16.

At the outset of the hearing, the ALJ identified Ms. Jarrell as a

vocational expert who "may offer some opinion testimony regarding the

nature of [Plaintiff's] past work and of the positions that are available in the

labor market."  Tr. 35.  Prior to testifying, the ALJ asked Ms. Jarrell whether

the record correctly stated her professional qualifications and she

responded that "[i]t does."[3]  Tr. 68.  Plaintiff's counsel had "no objections" to Ms. Jarrell serving as the VE.  Tr. 69.

Ms. Jarrell's resume appears in the record.  Tr. 162-64.  Among her qualifications, Ms. Jarrell states that she was a "Certified Disability Management Specialist" from 1997 through 2010, Tr. 162, when it appears, based on information provided by Plaintiff's counsel and attached to her memorandum, ECF No. 17-1, that Ms. Jarrell's certification in this field expired in 2008.  Plaintiff does not question any other representation made by Ms. Jarrell in her three-page resume.[4]

At the hearing, Plaintiff's counsel stated that he had no objection to Ms. Jarrell serving as the vocational expert in this case.  Tr. 69.  Without objection, the ALJ qualified Ms. Jarrell as a vocational expert for the purpose of the hearing.  *Id.*  The ALJ was not afforded the opportunity to inquire into the VE's qualifications or choose another VE.  As a result of her failure to object prior to this proceeding, Plaintiff waived her right to

---

[3]  Ms. Jarrell's resume is included in the record.  Tr. 162-64.  As noted by Plaintiff, this issue was not raised before the ALJ or Commissioner.  ECF No. 17 at 17.

[4]  Ms. Jarrell is no stranger to Social Security disability benefit cases, Plaintiff's counsel, and the undersigned.  *See, e.g.*, Saunders v. Colvin, Case No. 4:14cv83-MW/CAS, 2014 U.S. Dist. LEXIS 173693, at *1-2 (N.D. Fla. Nov. 25, 2014), *adopted*, 2014 U.S. Dist. LEXIS 173632 (N.D. Fla. Dec. 15, 2014).  In Saunders, Ms. Jarrell's resume appears with the same information, including the expired certification, as her resume in this case.  *Compare* ECF No. 10-4 at 177-79 in that case *with* Tr. 162-64.

challenge the VE's qualifications.  *See* King v. Astrue, No. C 09-05322

MEJ, 2011 U.S. Dist. LEXIS 49707, at *36-38 (N.D. Cal. May 10, 2011).

A case may be remanded upon "a showing that there is new

evidence which is material and that there is good cause for failure to

incorporate such evidence into the record in the prior proceeding."  Milano

v. Bowen, 809 F.3d 763, 766 n.2 (11th Cir. 1987).  To satisfy the criteria for

remand under sentence six of 42 U.S.C. § 405(g), a claimant must

establish that the evidence is new and noncumulative, the evidence is

material such that a reasonable probability exists that would change the

administrative result, and there was good cause for the failure to submit the

evidence at the administrative level.  *See* Caulder v. Bowen, 791 F.2d 872,

877 (11th Cir. 1986).

Even absent a finding of waiver on this issue, Ms. Jarrell's resume

reflects several years of experience in job placement.  Tr. 162-64; *see*

*generally* Reed v. Apfel, Civil Action No. 98-1019-P-G, 1999 U.S. Dist.

LEXIS 18623, at *11 (S. D. Ala. July 30, 1999), *adopted as modified*, 1999

U.S. Dist. LEXIS 18624 (S.D. Ala. Nov. 5, 1999).  In addition, Plaintiff does

not explain how a certification that expired in 2008, as opposed 2010, is

material and has any relevance to the hearing that took place in 2014.  It is

most improbable that the administrative result would have changed if the

ALJ and Commissioner knew that one of Ms. Jarrell's certifications had expired in 2008 rather than 2010.

Plaintiff also argues that Ms. Jarrell's testimony regarding other jobs Plaintiff is capable of performing in the national economy, a step five inquiry not determined by the ALJ, is nevertheless flawed making her testimony, as a whole, unreliable.  ECF No. 17 at 19-21.  The issues raised go to the weight accorded the VE's testimony.  *See* Reed v. Apfel, 1999 U.S. Dist. LEXIS 18623, at *11.  No error has been shown.

## B. Substantial evidence supports the ALJ's step four determination.

Plaintiff argues that the ALJ's step four finding is erroneous based on unsupported vocational testimony.  ECF No. 17 at 21-28.

Plaintiff's prior work history over the past 15 years before she became disabled is set forth in a Disability Report and a Work Report. Tr. 181, 189.  These jobs include *account specialist* for an assisted living facility for about 90 days in the winter of 2002; *front office coordinator* for a physical therapy business from January 2003 through June 2004; *receptionist* for dermatologists for about three weeks during the spring of 1997; and *staffing specialist* for a temporary agency from June 1995 through March 2007.  *Id.; see* Tr. 86.

Plaintiff provided additional information regarding her prior work during the past 15 years before she became unable to work.  Tr. 202-08 (Exhibit 5E).  (The VE relied, in part, on the information in Exhibit 5E.)  The first job is described as work for a temporary company ("Manpower") when she worked eight hours per day five days per week from 2004 to 2007 and was paid $27,500.  Tr. 202-03.  She supervised all of the "temps but no office staff" on an as-needed basis.  She hired and fired employees, but was not a lead worker.  Tr. 203.  Each workday she walked, stood, and sat, but did not climb.  She would stoop or bend down and forward at the waist, kneel, crouch, but not crawl or handle, grab, or grasp big objects.  She would reach for the phone.  She stated that she did not have to lift or carry heavy things because she had back pain in 2005, but added that "we didn't do it anyway."  *Id*.  The heaviest weight she lifted was less than 10 pounds, but she did not frequently lift stating "no lift."  *Id*.  She used machines, tools or equipment, technical knowledge or skills, and writing, completed reports, and performed duties like this.  *Id*.

Her next job title is described as "TOSPT" performed from 2003 to 2004, eight hours a day and five days per week.  She was paid hourly ($10.00/hr.).  Tr. 204.  She screened patients to see the doctors and answered the telephone.  Tr. 202, 204.  She walked, stood, and sat, but did

not climb.  She would kneel.  She did not crouch, crawl, handle, grab, or grasp big objects, and not reach.  She did not lift or carry at the doctor's office.  She used machines, tools or equipment, technical knowledge or skills, but did not perform any writing, complete reports, or perform duties like this.  Tr. 204.

The third job for which she worked eight hours per day and five days a week from 1995 through 2001, was again for a temporary company ("Manpower") in which she found temporary jobs around Tallahassee.  She was paid $12.00 an hour.  Tr. 202, 205.  During the workday, she walked, stood, sat, but did not climb.  She would stoop and kneel, but did not crawl, handle, grab, or grasp small or big objects and did not reach.  Tr. 205.  She used machines, tools or equipment, used technical knowledge or skills, and did writing, completed reports, and performed duties like this.  *Id.*

Plaintiff also worked in a nursing home (assisted living) as an "office helper" for eight hours a day and five days a week in 2003 and was paid $8.00 an hour.  She did not lift or carry.  She walked, stood, and sat, but did not climb, stoop, kneel, crouch, crawl, handle, grab or grasp big objects and did not reach, but she did write, type or handle small objects.  Tr. 202, 206.

Her last described job was "Tallahassee Pain Stress" and she worked as a front office helper, answered phones, and collected new patient paperwork for which she worked eight hours per day and five days per week from 1994 to 1996 and was paid $11.00 an hour.  Tr. 202, 207.  She described this job as front office helper, answered phones; they collected new patient paperwork.  Tr. 207.  She used machines, tools or equipment, but did not use technical knowledge and skills nor did she do any writing, complete reports, or perform duties like this.  She hand wrote appointment cards and log sheets.  She walked, stood, and sat, but did not climb, stoop, kneel, crouch, crawl, handle, grab or grasp big objects, but she would reach and write, type or handle small objects.  She did not lift or carry. (The heaviest weight lifted is checked and was less than 10 pounds; she frequently lifted less than 10 pounds.)  *Id.*  Plaintiff received earnings from these jobs from 1994 to 2000 and 2002 to 2007.  Tr. 168 170, 172.

At the February 20, 2014, hearing, Plaintiff testified that she completed the seventh grade and did not obtain a GED.  Tr. 39.

After Plaintiff's counsel provided an opening statement, Tr. 39-40, the following colloquy transpired.

> ALJ: Ms. Jarrell, anything specific that you need to hear from the claimant regarding her past work that will assist you for you to testify in the hearing today?

VE: She filled out a real good work history on [Exhibit] 5-E, but she has she has a seventh grade education, but she has banking courses, and I don't know what level she took them at or what they were and also that she was an account specialist and there wasn't much about that, just the Manpower.  Well, she was a placement person, an employment interviewer, so they're pretty standard by the DOT and from what she writes that she did.

ALJ: So you just need some clarification of which job now?

VE: Yeah.  On the account specialist because it had banking courses and you put you were an accountant specialist.  I'd like to know what you did.

ALJ: Will you be able to work that into your questioning, Mr. Sullivan?

ATTY: I think I can figure something out, Judge.

ALJ: I have faith in you.  All right.  I have reviewed the medical documentation.  If you want to direct my attention to specific examples of the record that you feel support your assertion of disability, feel free to point them out as we go.  And with that, please begin your direct examination of your client.

ATTY: Thank you, Judge.

BY THE ATTORNEY:

Q Ma'am, the account specialist job.  I think that was when you were at the assisted living facility. Do you remember that?

A Yes.

Q Okay.  Can you tell me what you did there?

A Basically they had hired me to help answer phones and, you know, just greet people as they walked in, and I was supposed to help do some accounting, you know, like posting into

a computer receipts for the nursing home, you know, like food receipts.

No billing for like, you know, patients, I mean, who were staying being, you know, their parents, I mean, or people paying for them.  This was just like just basic receipts that came in --

Q You would enter that into the computer?

A - - like MPS or something. Yeah.

Q I see.

A It was really very simple, nothing very mandatory or hard.

Q Okay.  And the education, those classes you were taking, what was that all about?

A Do you mean the banking courses?

Q Yes.

A Those were just I was a teller at the time, just a banking teller, and the banking courses were required by the bank - - it was Southern Bank of Tallahassee -- for you to maintain there or move up, and it was simple like customer service skills, how to be polite.  We went to Lively Vo-Tech and just basically they taught you how to be friendly and, you know, greet people.

VE: So it wasn't accounting?

CLMT: No.

VE: That's all I wondered.

CLMT: I mean, the accounting, I know the accounting specialist is what they called the position, but it required no special education or --

VE: Okay.

CLMT:  -- background.

VE: There's an accounts receivable clerk and that's what I put her down as because she --

CLMT: And that was just taking simple, little receipts and posting them in the computer, but it was so -- you know, it was

VE: Okay.

CLMT: You didn't have to have a degree or anything to do --

VE: Right.

CLMT: -- that particular work.

VE: Okay.  So I'll just put it down as like data entry - -
ATTY: Okay.

VE: -- since that's all she does.  Okay.

CLMT: They always made the job sound a lot better than it really was.

ATTY: You had a big title.

CLMT: Yes. Big titles, yeah.

Tr. 40-43.

Following Plaintiff's testimony, Ms. Jarrell testified regarding Plaintiff's

past relevant work.  Ms. Jarrell characterized Plaintiff's past relevant work.

Really it's pretty much like a front desk receptionist, all of it, because she answered phones, took messages.  I mean, that's what all of it says.  And so the *DOT* [Dictionary of Occupational Titles] is

237.367-010,[5] sedentary with an SVP of 3.  And I use it because she uses that as a sketch.  She was at a doctor's office.  She was answering the phones and telling people when their appointment was, so --

And then she was an office helper also, which is an office clerk, routine, and I'm just going to – I have a higher one, but since from the testimony I'm going to drop it down too.  Office helper, clerical.  The *DOT* is 239.567-010,[6] light, with an SVP of 2, unskilled.

———————————————

5  DOT 237.367-010 provides: **237.367-010 APPOINTMENT CLERK (clerical) alternate titles: reception clerk**

Schedules appointments with employer or other employees for clients or customers by mail, phone, or in person, and records time and date of appointment in appointment book.  Indicates in appointment book when appointments have been filled or cancelled.  May telephone or write clients to remind them of appointments.  May receive payments for services, and record them in ledger. May receive callers [RECEPTIONIST (clerical)].  May operate switchboard [TELEPHONE OPERATOR (clerical)].
*GOE: 07.04.04 STRENGTH: S GED: R3 M2 L3 SVP: 3 DLU: 77*

Dictionary of Occupational Titles (DOT) (4th Ed., Rev. 1991), Occupational Group Arrangement.

6  DOT 239.567-010 provides: **239.567-010 OFFICE HELPER (clerical)**

Performs any combination of following duties in business office of commercial or industrial establishment: Furnishes workers with clerical supplies.  Opens, sorts, and distributes incoming mail, and collects, seals, and stamps outgoing mail.  Delivers oral or written messages.  Collects and distributes paperwork, such as records or timecards, from one department to another. Marks, tabulates, and files articles and records.  May use office equipment, such as envelope-sealing machine, letter opener, record shaver, stamping machine, and transcribing machine.  May deliver items to other business establishments [DELIVERER, OUTSIDE (clerical) 230.663-010].  May specialize in delivering mail, messages, documents, and packages between departments of establishment and be designated Messenger, Office (clerical).  May deliver stock certificates and bonds within and between stock brokerage offices and be designated Runner (financial).
*GOE: 07.07.03 STRENGTH: L GED: R2 M2 L2 SVP: 2 DLU: 81*

DOT (4th Ed., Rev. 1991), Occupational Group Arrangement.

> Or maybe a front office worker.  That might fit better because she did do more than the basics at this job.  What she said she did was well, she just says office helper, so I don't really know what she did actually as an office helper [at the nursing home].

Tr. 72.  In response to the VE asking, "You had no lifting, no carrying?",

Plaintiff explained that "you sat at the front of the nursing home at a desk

and [] answered the telephone…. And then people came in that's it[.]"

Tr. 72-73.  The VE asked, "[f]ront desk receptionist" and Plaintiff replied,

"Yeah.  I mean, that's all it was."  Tr. 73.  Ms. Jarrell testified that the job

was classified as a front desk receptionist, DOT 237.367-010, sedentary,

with an SVP of 3, semi-skilled, and Plaintiff's counsel did not object or offer

any alternative explanation.[7]  Tr. 72-73.  The VE agreed with the ALJ's

---

[7]  "Semi-skilled work is work which needs some skills but does not require doing the more complex work duties.  Semi[skilled jobs may require alertness and close attention to watching machine processes; or inspecting, testing or otherwise looking for irregularities; or tending or guarding equipment , property, materials, or persons against loss, damage or injury; or other types of activities which are similarly less complex than skilled work, but more complex than unskilled work.  A job may be classified as semi-skilled where coordination and dexterity are necessary, as when hands or feet must be moved quickly to do repetitive tasks."  20 C.F.R. § 404.1568(b).  An SVP of 3 means "[o]ver 1 month up to and including 3 months."  <u>Dictionary of Occupational Titles</u> (DOT) (4th Ed., Rev. 1991), Appendix C: Components of the Definition Trailer, § II, SVP.  In part, "[l]ight work involves lifting no more than 20 pounds at a time with frequent lifting or carrying objects weighing up to 10 pounds. . . If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time"  20 C.F.R. § 404.1567(b).  "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledges, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary carrying out job.  Jobs are sedentary walking and standing are required the case other sedentary criteria are met."  20 C.F.R. § 404.1567(a).

question "that basically encompasses both jobs" and the VE responded

"[t]hat's all, yeah.  That's what she did everywhere it sounds like.  That's

from the work history of [Exhibit] 5-E[,]" Tr. 202-08.  Tr. 73.

The ALJ then asked Ms. Jarrell to assume an individual with Plaintiff's

age, education, and work experience, who was "able to perform a range of

light work" with the following limitations:

> [i]s able to lift, carry and push/pull ten pounds frequently, but no more
> than 15 pounds occasionally.  The person cannot climb ladders,
> ropes or scaffolds, can occasionally climb ramps and stairs.  The
> person is limited to frequent balancing and crawling, but only
> occasional kneeling, crouching and stooping.  The person could
> tolerate up to frequent exposure to hazards such as unprotected
> heights and heavy machinery.
>
> The dominant right upper extremity is limited to no overhead
> reaching, frequent reaching, handling, fingering and feeling in all
> directions.  The person has no limitations with the nondominant left
> upper extremity.  The person is able to sit upwards of 30 to 45
> minutes before having to stand briefly to relieve any discomfort.  The
> person is able to stand 30 to 45 minutes and walk upwards of 50
> consecutive yards before having to stop briefly before resuming
> walking.

Tr. 73-74 (emphasis added).  Ms. Jarrell testified that the individual could

perform "[a]ll past, the four past" jobs and could perform other light, semi-

skilled work as a general office clerk (DOT 209.562-010) and companion

(DOT 309.677-010), and as a "cashier II.  *DOT* is – and I'm talking about a

ticket seller – 211.462-030.  It's light with an SVP of 2, unskilled."  Tr. 74-

75.

The ALJ asked the VE to assume an individual limited to sedentary work with all the other limitations as previously stated with the exception of being limited to ten pounds frequently and occasionally.  Ms. Jarrell testified that the individual could perform "all past [work]."  Tr. 75.  Ms. Jarrell testified that her testimony had been consistent with the DOT.  *Id.*

The ALJ determined at step four that Plaintiff "was capable of performing past relevant work as a front desk receptionist.  This work did not require the performance of work-related activities precluded by the claimant's [RFC]."  Tr. 26.  The ALJ explained:

> The impartial [VE] testified that the claimant has past relevant work as a front desk receptionist, a semi-skilled job performed at the sedentary level of exertion.  The [VE] further testified that an individual of the same age as the claimant with the same education, past work experience and the [RFC] set forth therein could perform the job up front desk receptionist as actually and generally performed.  Based on all the foregoing, the undersigned concludes the demands of the claimant's past relevant work as a front desk receptionist do not exceed her [RFC] and the claimant can return to her past relevant work as a front desk receptionist.

Tr. 26-27.

Plaintiff makes two arguments regarding the ALJ's step four determination.  ECF No. 17 at 21-28.  Plaintiff argues the ALJ's RFC findings are more restrictive than the hypothetical posed to the VE.  ECF No. 17 at 22.  Plaintiff contends that the ALJ used the phrase "upwards of"

in two places in the hypothetical as opposed to "no more than" or "can" in the RFC.  ECF No. 17 at 22-23; Tr. 73-74 and *supra* at 40-41 (hypotheticals).  Plaintiff posits that the ALJ's finding that Plaintiff can return to her past relevant work as a front desk receptionist is not supported by substantial evidence.

The Commissioner contends that the phrase "upwards of 30 to 45 minutes" can be read to mean more than 30 minutes but less than 45 minutes and comports with the ALJ's RFC, which is a range of 30 to 45 minutes as the upper range before having to rest.  The Commissioner further argues that even if the Court were to find that the hypothetical was less restrictive than the RFC, Plaintiff did not sustain her burden to prove that she could not perform her past relevant work with the stated RFC.  ECF No. 20 at 14-14.  The Commissioner further argues that Plaintiff did not demonstrate how the restriction of "able to sit no more than 30 to 40 minutes before standing to relieve any discomfort" prevents her from performing her past relevant work as a front desk receptionist, which is a semi-skilled job and performed at the sedentary level of exertion as determined by the ALJ.  ECF No. 20 at 15; Tr. 26.  Plaintiff ends her analysis regarding the limitation arguing that there is a discrepancy between the hypothetical and the RFC.

Plaintiff contends the 50-yard walking restriction hypothetical is less restrictive than the RFC.  ECF No. 17 at 22.  Plaintiff does not explain how the walking distance restriction, read either way, prohibits her from performing her past relevant work as a front desk receptionist.

Further, Plaintiff argues that she did not perform past relevant work as a front desk receptionist.  ECF No. 17 at 24-28.  In support, Plaintiff argues that the VE's testimony was flawed and vague.  ECF No. 17 at 24.  Although not a model of clarity, the VE reviewed Plaintiff's work history and Plaintiff was questioned under oath about how her jobs were actually performed.  Tr. 70-73.  In response from a question posed by the ALJ, the VE characterized Plaintiff's jobs at the medical office, the nursing home, the physical therapy office and with the temporary placement agency as a front-desk receptionist, DOT 237.367-010, sedentary, with an SVP of 3, semi-skilled.  Tr. 73.  Plaintiff argues, however, that she did not have enough time to work in the medical office for it to be classified as past relevant work.  ECF No. 17 at 25-26.  In support, Plaintiff argues she worked at the medical office for only three weeks, ECF No. 17 at 26, which is true.  *See, e.g.*, Tr. 86.  Nevertheless, the VE expressly opined, without objection, Plaintiff's work with the temporary placement agency for 12 years is categorized as front desk receptionist.  Tr. 73-74.

Notwithstanding, Plaintiff then argues that her other jobs were composite jobs and not properly evaluated.  ECF No. 17 at 26-28.  Plaintiff does not explain how her job at the temporary placement agency or any other jobs were composite.  Plaintiff cites to case law regarding composite jobs, but does not provide a factual explanation as to how Plaintiff's other jobs were composite.

In SSR 82-61, 1982 SSR LEXIS 31 (1982), it is stated that "a claimant will be found to be 'not disabled' when it is determined that he or she retains the RFC to perform: 1.  The actual functional demands and job duties of a particular past job relevant job; or 2.  The functional demands and job duties of the occupation as generally required by employers throughout the national economy."  *See* <u>Macia v. Bowen</u>, 829 F.2d 1009, 1012 (11th Cir. 1987).  Accordingly, substantial evidence supports the ALJ's step four finding that Plaintiff could return to her past relevant work as a front desk receptionist.  Tr. 26.

Furthermore, the issues raised by Plaintiff could have been clarified during the hearing.  Instead, Plaintiff's counsel asked no questions of Plaintiff or the VE to clarify the extent and scope of the VE's characterizations of Plaintiff's past relevant work.  Tr. 75.  *See* <u>Wright-Hines v. Comm'r of Soc. Sec.</u>, 597 F.3d 392, 396 (6th Cir. 2010); <u>Barnes v.</u>

Sullivan, 932 F.2d 1356, 1358-59 and n.4 (11th Cir. 1991); *see also* Eyre v. Comm'r of Soc. Sec. Admin., 586 F. App'x 521, 524 (11th Cir. 2014) (unpublished) ("Furthermore, Eyre offered no evidence to rebut the ALJ's reasonable determination that she had engaged in substantial gainful activity as a kitchen helper and a hotel housekeeper." *See* Barnes, 932 F.2d at 1359"). The general rule in this circuit is that "an argument not raised in the administrative hearing cannot be raised on appeal." Alacare Home Health Servs., Inc. v. Sullivan, 891 F.2d 850, 855 n.5 (11th Cir. 1990) (citations omitted), *abrogated on other grounds*, Sebelius v. Auburn Reg'l Med. Ctr., 133 S.Ct. 817 (2013). Accordingly, Plaintiff waived her right to raise this argument by not presenting it to the ALJ, the final decision-maker in this case. No error has been shown.

### C. Substantial evidence supports the ALJ's credibility findings and RFC determination.

In her third and fourth arguments, Plaintiff argues that the ALJ's credibility determination and RFC determination are not supported by substantial evidence. ECF No. 17 at 28-34. Plaintiff contends that the ALJ did not properly consider Plaintiff's ulnar neuropathy and carpal tunnel syndrome before the RFC determination and no manipulative limitations and the ALJ's credibility assessment did not comply with SSR 96–7p and Eleventh Circuit law. ECF No. 17 at 28, 31.

To determine if Plaintiff could perform her past relevant work at step four or other work at step five,[8] the ALJ was required to assess Plaintiff's RFC.  Tr. 23; *see* 20 C.F.R. § 404.1520(a)(4)(iv-v), (e).  An RFC is the most a claimant can still do despite limitations.  20 C.F.R. §§ 404.1520(e), 404.1545(a)(1), (a)(3).  It is an assessment based upon all of the relevant evidence including the claimant's description of her limitations, observations by treating and examining physicians or other persons, and medical records.  *Id.*  The responsibility for determining claimant's RFC lies with the ALJ.  20 C.F.R. § 404.1546(c); *see* SSR (SSR) 96-5p, 1996 SSR LEXIS 2, at *12 (July 2, 1996) ("The term "*residual functional capacity assessment*" describes an adjudicator's finding about the ability of an individual to perform work-related activities.  The assessment is based upon consideration of all relevant evidence in the case record, including medical evidence and relevant nonmedical evidence, such as observations of lay witnesses of an individual's apparent symptomatology, an individual's own statement of what he or she is able or

---

[8]  The ALJ did not determine whether Plaintiff could perform other jobs in the national economy at step five.  Tr. 26-27; *see* 20 C.F.R. § 404.1520(a)(4), (providing that if a claimant is found to be not disabled at any particular step in the sequential analysis, the Commissioner will make its determination without moving on to the next step).

unable to do, and many other factors that could help the adjudicator

determine the most reasonable findings in light of all the evidence.").

Further, when a claimant attempts to establish a disability based on

his subjective complaints, she must provide evidence of an underlying

medical condition in either objective medical evidence confirming the

severity of the alleged symptoms or that the medical condition reasonably

could be expected to give rise to the alleged symptoms. *See* 20 C.F.R.

§ 404.1529(a) and (b); Wilson, 284 F.3d at 1225-26.

Pain is subjectively experienced by the claimant, but that does not

mean that only a mental health professional may express an opinion as to

the effects of pain. One begins with the familiar way that subjective

complaints of pain are to be evaluated:

> In order to establish a disability based on testimony of pain and
> other symptoms, the claimant must satisfy two parts of a three-
> part test showing: (1) evidence of an underlying medical
> condition; and (2) either (a) objective medical evidence
> confirming the severity of the alleged pain; or (b) that the
> objectively determined medical condition can reasonably be
> expected to give rise to the claimed pain.

Wilson, 284 F.3d at 1225. *See* 20 C.F.R §§ 404.1529 (explaining how

symptoms and pain are evaluated); 404.1545(e) (regarding RFC, total

limiting effects).[9]  This is guidance for the way the ALJ is to evaluate the claimant's subjective pain testimony because it is the medical model, a template for a treating physician's evaluation of the patient's experience of pain.

To analyze a claimant subjective complaints, the ALJ considers the entire record, including the medical records; third-party and Plaintiff's statements; the claimant's daily activities; the location, duration, frequency, and intensity of pain or other symptoms; the type and dosage, effectiveness, and side effects of medication; precipitating and aggravating factors; treatment, other than medication, received for pain or other symptoms; and other factors concerning functional limitations and restrictions.  20 C.F.R § 404.1529(c)(3)(i-vii).  The Eleventh Circuit has stated: "credibility determinations are the province of the ALJ."  Moore, 405 F.3d at 1212 ("The ALJ may discount subjective complaints of pain if inconsistencies are apparent in the evidence as a whole.").

In determining where the substantial evidence supports the ALJ's credibility determination, "[t]he question is not . . . whether ALJ could have reasonably credited [claimant's] testimony, but whether the ALJ was clearly

_____

[9]  Although the ALJ did not expressly refer to the three-part part standard, it is clear that the ALJ's findings, discussion, and citation to 20 C.F.R. §§ 404.1529 and 416.929, Tr. 23, 26, indicate that the pain standard was applied.  Wilson, 284 F.3d at 1226.

wrong to discredit." Werner v. Comm'r of Soc. Sec., 421 F. App'x 935, 939 (11th Cir. 2011) (unpublished).

Although not dispositive, the ALJ may consider a claimant's daily activities when evaluating subjective complaints of disabling pain and other symptoms. 20 C.F.R. § 404.1529(c)(3)(i); Macia v. Bowen, 829 F.2d at 1012. *But see* Lewis v. Callahan, 125 F.3d at 1441 ("participation in everyday activities of short duration, such as housework or fishing" does not disqualify a claimant from disability).

The ALJ here determined that Plaintiff's statements concerning the intensity, persistence, and limiting effects of her alleged symptoms were not "entirely credible" because they were inconsistent with the evidence of record. Tr. 24.

At step two, the ALJ noted that the record contained complaints of, or references to, carpal tunnel syndrome among other ailments, but concluded that "no significant functional limitations are established in conjunction with these conditions. Neither the record nor the claimant's testimony establishes preponderant evidence of more than minimal functional limitations which, since the alleged onset date, have persisted or which are expected to persist continuously for at least 12 months in conjunction with these conditions prior to the date last insured.

Accordingly, these alleged impairments are not "severe" and the meaning of the Social Security Act." Tr. 20-21 (citation omitted).  The ALJ considered Plaintiff's testimony that "[s]he had problems with her right hand with pain and numbness.  She reported that she had problems with her grip and would frequently drop things.  She indicated that she cannot raise her right arm too high."  Tr. 23.

Plaintiff received general medical care for back, headaches, and other conditions with Dr. Winchester between January 2010 and July 2013 without a notation relating to carpal tunnel syndrome.  Tr. 271-90, 317-50, 373-79.  Plaintiff received care from Dr. Alexander, an orthopedist, and others associated with Dr. Alexander, from on or about June 30, 2009, through September 18, 2013, without mention of problems associated with carpal tunnel syndrome.

Plaintiff sought treatment from Drs. Ayala and Ortiz, from Tallahassee Neurological Clinic, beginning on June 1, 2012, and continuing until February 10, 2014.  *See supra* at 20-23.  On June 1, 2012, Plaintiff sought treatment with Dr. Ayala due to right-side paresthesias and weakness over the past year.  Tr. 263.  He recommended an EMG of the right extremity for ulnar neuropathy and, in the interim, suggested that Plaintiff avoid any pressure on the elbows and try to keep them straight as possible for most

of the day.  Tr. 266.  On June 20, 2012, Dr. Ayala opined that EEG was

essentially unremarkable and the cervical MRI indicated "some

degenerative disease."  Tr. 256, 261-62.  He diagnosed Plaintiff with

hemiparesis, dominant side, right; and ulnar neuropathy, right, for which

Tramadol was prescribed.  *Id.*  By December 2012, Plaintiff reported

constant neck pain with ongoing weakness on the right side.  Tr. 380.

Dr. Ayala noted Plaintiff had weakness of the interosseous muscles of the

hand, but also weakness of the deltoid, biceps, triceps, iliopsoas,

quadriceps, anterior tibialis, and had giveaway weakness on the right side

compared to the left, but 4/5 throughout.  Tr. 382.

　　After a car accident, on January 3, 2013, Plaintiff reported increased

numbness and pain.  Tr. 357, 364-68.  An EMG/NCV study did not show

any evidence of myopathy, neuropathy or radiculopathy "except for carpal

tunnel syndrome bilaterally which is probably causing some of the

symptoms she is having after the motor vehicle accident."  Dr. Ortiz further

opined: "from my part she does have diffuse musculoskeletal pain as well

as carpal tunnel syndrome bilaterally."  Tr. 357, 363.  The diagnoses

included carpal tunnel syndrome, for which wrist splints were prescribed.

Tr. 358-59.  At the time, Plaintiff's medications included Neurontin, Ultram,

Hydrocodone-Acetaminophen, and Zanaflex.  Tr. 359.

On or about February 10, 2014, Plaintiff reported ongoing numbness and pain in her legs and a general lack of improvement of symptoms since 2012, and her diagnoses remained the same with ongoing evaluation. Tr. 489.  The results of the physical examination indicated, in part, that Plaintiff was in no acute distress and she had decreased ROM, both of which remain unchanged from January 3, 2013.  Impressions included numbness/paresthesia assessed as deteriorated and carpal tunnel syndrome.  Tr. 491.

As noted above, Plaintiff received diagnoses and impressions that she had carpal tunnel syndrome.  It appears that she received conservative treatment that included the wearing of wrist splints and prescriptions for medication.[10]  None of her physicians opined that Plaintiff suffered functional limitations as a result of having carpal tunnel syndrome or ulnar neuropathy such that she was unable to do any work.[11]

Based on his review of the record, the ALJ found Plaintiff had the RFC to perform light work with exceptions.  Tr. 23.  At step two, the ALJ

---

[10]  The ALJ determined that Plaintiff's "use of medications does not suggest the presence of an impairment is more limited than found in this decision.  There is no evidence of any significant side effects of medications."  Tr. 26.

[11]  Further, Plaintiff testified that no physician has recommended surgery for her carpal tunnel syndrome and stated: "I have no idea what they're going to do.  We're still working on the carpal tunnel."  She is also doing hand exercises with "like a little ball."  Tr. 68.

determined that Plaintiff had several severe impairments, which did not include carpal tunnel syndrome.  Tr. 20.  The ALJ noted, however, that Plaintiff's carpal tunnel syndrome posed "no significant functional limitations."  *Id.*  (Plaintiff does not challenge this specific determination, although Plaintiff argues that the ALJ's RFC assessment is lacking.)

Although Plaintiff may have impressions, diagnoses, and complaints of carpal tunnel syndrome and ulnar neuropathy, she did not establish any functional limitations, which is consistent with the absence of any such determinations made by her treating physician's.  "[A] diagnosis earlier showing 'a deviation from purely medical standards of filing perfection now' is insufficient; instead the claimant must show the effect of the impairment on her ability to work."  Wind v. Barnhart, 133 F. App'x 684, 690 (11th Cir. 2005) (unpublished) (quoting McCruter v. Bowen, 791 F. 2d 1544, 1547 (11th Cir. 1986)); *see* Davis v. Barnhart, 153 F. App'x 569, 572 (11th Cir. 2005) (unpublished).

As noted above, Plaintiff's carpal tunnel syndrome was treated conservatively with a wrist splints and medications were prescribed as needed.  *See, e.g.*, Tr. 417, 491.  The ALJ considered Plaintiff's subjective complaints, but determined that her severe impairments did not prevent her

from performing light work, "with minor non-exertional limitations throughout the period under consideration."  Tr. 25.

The ALJ did not rely solely on Plaintiff's activities in evaluating the credibility of her subjective complaints, nor did the ALJ find Plaintiff's activities to be dispositive evidence of his ability to work.  *See, e.g.*, Tr. 24. Rather, the ALJ considered Plaintiff's activities with other evidence in the record, Tr. 21, 23-26.  20 C.F.R. § 404.1529(c)(3)(i); Dyer v. Barnhart, 395 F.3d 1206, 1212 (11th Cir. 2005); Macia v. Bowen, 829 F.2d at 1012.

Given the record as a whole, the ALJ properly applied the case law and regulations for evaluating Plaintiff's subjective complaints, weighed the evidence, and found that Plaintiff's testimony regarding the intensity, persistence, and limiting effects of his symptoms was not "entirely credible." Tr. 23-26.

The ALJ found the objective medical evidence did not support the severity of symptoms Plaintiff allegedly experienced, which the ALJ is allowed to consider.  Tr. 23-26.  The ALJ's decision reflects that he properly considered Plaintiff's subjective complaints, the objective medical findings, and other relevant evidence in assessing Plaintiff's RFC and the credibility of Plaintiff's allegations of disabling limitations.  20 C.F.R § 404.1529(c)(2); Wilson, 284 F.3d at 1225-26.

Further, the ALJ did not violate the pain standard because, although the ALJ found that Plaintiff's impairments could reasonably be expected to cause the alleged symptoms, the ALJ articulated explicit and adequate reasons for discrediting her subjective testimony, which was critical to her claim.  *See* Wilson, 284 F.3d at 1255; Marbury, 957 F.2d at 839.

The Commissioner is charged with the duty to weigh the evidence, resolve material conflicts in the testimony, and to determine the case accordingly.  Wheeler, 784 F.2d at 1075.  Even if the Court disagrees with the ALJ's resolution of the factual issues and would resolve these issues differently, the ALJ's decision must be affirmed where it is supported by substantial evidence.  In this case, substantial evidence supports the ALJ's finding the Plaintiff's statements about her symptoms were not "entirely credible."  Substantial evidence supports the ALJ's assessment of Plaintiff's RFC and Plaintiff did not prove she had additional limitations on her ability to perform prior relevant work.

## VI. Conclusion

Considering the record as a whole, the findings of the ALJ are based upon substantial evidence in the record and the ALJ correctly applied the law.  Accordingly, it is respectfully recommended that the decision of the Commissioner to deny Plaintiff's application for Social Security benefits be

**AFFIRMED** and judgment entered for Defendant.

   **IN CHAMBERS** at Tallahassee, Florida, on June 28, 2016.

                    s/ Charles A. Stampelos
                    **CHARLES A. STAMPELOS**
                    **UNITED STATES MAGISTRATE JUDGE**

           <u>**NOTICE TO THE PARTIES**</u>

**A party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 14 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**